IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 27, 2021


**JOHN A. BOATFIELD v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Hamilton County**
**No. 308809      Don Poole, Judge**

_____

**No. E2020-01427-CCA-R3-ECN**

_____

In 2000, a Hamilton County jury convicted the Petitioner of the first degree murder of his wife and of the abuse of her corpse, and the trial court sentenced him to life plus two years in the Tennessee Department of Correction. This court affirmed the judgments on appeal. *State v. Boatfield*, No. E2000-01500-CCA-R3-CD, 2001 WL 1635447, at *1 (Tenn. Crim. App., at Knoxville, Dec. 20, 2001), *perm. app. denied* (Tenn. June 3, 2002). The Petitioner unsuccessfully sought post-conviction relief, *Boatfield v. State*, No. E2005-01949-CCA-R3-PC, 2006 WL 2135449 (Tenn. Crim. App., at Knoxville, July 31, 2006), *perm. app. denied* (Tenn. Nov. 13, 2005), and federal *habeas corpus* relief. The Petitioner then filed a petition for a writ of error *coram nobis*, alleging as newly discovered evidence a June 20, 2018 deposition in which the deponent stated that deponent's brother, who was originally a suspect in this murder, admitted committing the murder. The Petitioner also alleged that a jewelry box taken at the time of the murder was found in the home of a suspect in the original investigation. After a hearing, the *coram nobis* court denied the Petitioner relief, and he now appeals. After review, we affirm the judgment of the *coram nobis* court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS, P.J., and D. KELLY THOMAS, JR., J. joined.

Donna Miller, Chattanooga, Tennessee, for the appellant, John A. Boatfield.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General for the appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Trial**

This case arises from the death of the victim, the Petitioner's wife, who was shot in the head and stabbed twice in the abdomen and found in their bed, which had been set ablaze. In summarizing the facts presented at trial, this court stated:

> On March 12, 1998, firemen responded to a fire at the home of the [Petitioner] and discovered the [Petitioner's] wife, Emily Denise "Nicy" Boatfield, dead in her bed with bedclothes piled over her. A fire had been set beneath the bed using gasoline. Kitchen matches, a .22 caliber shell casing, and the [Petitioner's] .22 caliber rifle were in the charred debris. The rifle was cocked with a round in the firing chamber. Arson investigator Alec Conner opined that the fire was typical of a fire set to conceal a crime. The fire was confined to the master bedroom.
>
> The victim was shot in the head and stabbed twice in the abdomen. Her right leg and foot were burned and charred black. Dr. Frank King, Hamilton County medical examiner, testified the victim was first shot and then stabbed. According to Dr. King, the gunshot killed her within seconds; she was then stabbed as she died or soon thereafter; and she died before the fire started. He said the victim's right hand was not injured, nor did she have any defensive wounds. He estimated she died between 8:00 a.m. and 10:00 a.m.
>
> Dr. King opined she was probably shot in bed, and it was highly improbable she was shot elsewhere and moved to the bed. Thick blood and tissue were around the pillow on the bed. He testified blood found elsewhere in the master bedroom and hall was disbursed from the bed after the victim's death, probably by the firemen. No foreign genetic material was found underneath the victim's fingernails. Forensic tests revealed the shell casing found was fired from the [Petitioner's] rifle. Dr. King stated the victim's stab wounds were consistent with the use of a single-edge knife blade.
>
> The home showed signs of an apparent burglary. In the living room, the gun cabinet was opened by force, and a container of .22 caliber bullets, bearing the [Petitioner's] fingerprints, was spilled on the floor. A tire tool was found in the floor. Tommy McMillin, the [Petitioner's] son-in-law, identified the tire tool as one he had been using to repair a car in the Boatfields' backyard the day before the murder. McMillan said he left the tool in the backyard by an outbuilding.
>
> Both the master bedroom and the bedroom belonging to the Boatfields' teenage daughter were ransacked. Jewelry boxes were open and their contents strewn. The back door, which had an ADT Security sticker on the window, appeared to have been forced open using the tire tool.

When officers arrived at the crime scene, they found televisions and a stereo in the home. Three guns were in the gun cabinet. The victim's jewelry, including diamond rings, a watch, necklace and earrings, were still on her body. A purse, pager, cellular telephone and keys were on the kitchen table. The [Petitioner] told insurance investigator Danny Walker that jewelry, silver bars, money and old coins were taken. He told Walker and the police that no guns were missing. He also told the police he had loaded the .22 caliber rifle to shoot at dogs, and it possibly had five rounds in it.

Officer Rick Phillips, who lived in the neighborhood, testified it was a safe neighborhood and 20 to 30 officers resided within four miles of the Boatfield home. The neighborhood is a high traffic area with homes adjacent to the Boatfield home located only 75 to 100 feet away. One belonged to Dee Newell, who kept three dogs in a fence close to the Boatfields' driveway. Officer Phillips and Inspector Michael Mathis testified that Newell's dogs barked most of the time they were present at the crime scene. Newell testified one of her dogs barked at strangers, but on the morning of the murder, she did not hear the dogs bark until the fire trucks arrived.

There was a sign in the front yard of the Boatfield home indicating it was monitored by ADT Security. The house and all of the yard are visible from the road. Two of the Boatfields' vehicles, the [Petitioner's] red truck and a Saturn, were parked in the driveway. The Boatfields' dog, a Chihuahua named Chico, would bark when someone entered the home and was protective of the victim. The [Petitioner] told insurance investigator Walker, his father-in-law Ray Smith, and the police that Chico was in the house. After the murder, Chico was found unharmed outside the house.

On the morning of the murder, the [Petitioner] and Candace Boatfield, the teenage daughter of the [Petitioner] and the victim, left home in the victim's new purple truck just before 7:00 a.m. They made a brief stop at the [Petitioner's] business, Nursery Brokers, and arrived at a restaurant for breakfast by 7:00 a.m. The [Petitioner] told Detective Charles Dudley that his wife was asleep when they left. Candace Boatfield testified they remained at the restaurant for an hour or less. Then the [Petitioner] took her to school, where they arrived at approximately 8:05 or 8:10 a.m. During the drive to school, the [Petitioner] told his daughter he was going to wash the truck, pick up parts for his dune buggy and go to work.

The [Petitioner] told Detective Dudley he returned home, where his wife was awake and watching television. He said she asked him to spend the day with her, but he declined because he had work to do. The [Petitioner]

3

said he told her he would wash her truck. He also called his brother at Nursery Brokers.

According to telephone company records, a one minute phone call was placed from the Boatfield residence to Nursery Brokers at 8:57 a.m. Tommy McMillin testified the [Petitioner] called Nursery Brokers between 9:00 and 9:05 a.m. and then arrived at the business 15 to 20 minutes later. The [Petitioner] told Detective Dudley he left home some time after 9:00 a.m. In a recorded interview with insurance investigator Walker, the [Petitioner] said his wife was watching television when he left the house at 9:15. After the [Petitioner] arrived at Nursery Brokers, he left in the purple truck, stating he was going to wash the truck and pick up parts.

ADT Security Services received a fire alarm call from the Boatfield residence at 9:22 a.m. At 9:27 a.m., ADT called the [Petitioner's] business and a man stated the [Petitioner] was not there. McMillin testified he answered the telephone when ADT called and told them the [Petitioner] would return in 30 minutes.

The [Petitioner] told Detective Dudley he arrived at the carwash approximately 15 minutes after he left Nursery Brokers. Betty Grant and Virgil Garner, East Ridge Carwash employees, recalled the [Petitioner] arriving at the carwash at approximately 10:00 a.m. driving a purple truck. The [Petitioner] told Detective Dudley he was at the carwash for about five to ten minutes. According to the [Petitioner's] statement to Detective Dudley, he put gas in the truck and went to Capital Toyota where he stayed about 20 minutes.

He said he then went to Advance Auto Parts, where he spent about 30 minutes. Stephen Johns and Robert Massengale, employees of Advanced Auto Parts, recalled the [Petitioner] coming into the store that morning to pick up dune buggy parts. Johns said he offered to sell the [Petitioner] some old Volkswagen parts at a reduced price, and, after a ten to fifteen-minute discussion, the [Petitioner] purchased them as well. He did not recall the [Petitioner's] request to use the telephone. Massengale recalled giving the [Petitioner] permission to use the telephone. The [Petitioner] told Inspector Michael Mathis he tried to call home and Nursery Brokers, but got no answer. Telephone records show no phone calls were placed from Advance Auto to the Boatfield residence or Nursery Brokers. The [Petitioner] completed his purchases at Advanced Auto at 10:55.

The [Petitioner] told insurance investigator Walker he proceeded to the car dealership after he left Advanced Auto and then went to the home of

4

Alvin Walker, Jr., who was repairing the [Petitioner's] dune buggy. According to stipulated statements by Alvin Walker, Jr. and his father, Alvin Walker, Sr., Walker, Sr. answered the door and told the [Petitioner] there had been a fire at his house. The [Petitioner] replied that Walker, Sr. should not joke about things like that. When Walker, Sr. told the [Petitioner] his wife was found inside the house, the [Petitioner] fell to the ground screaming and crying. Walker, Jr. drove the [Petitioner] to his home, where the [Petitioner] refused to get out of the vehicle and asked Walker, Jr. to take him to his mother's home.

In the [Petitioner's] statement to Detective Dudley, he stated Walker, Sr. said he was sorry to hear about his wife. The [Petitioner] said he asked Walker, Sr. what he was talking about and Walker, Sr. told him his house had caught fire and his wife had died.

Martha McNabb, the victim's mother, testified that in January or February 1998, the victim called her after awaking to a suspicious fire in her bedroom, which apparently was started by a lit candle. She said the victim suspected the [Petitioner] or their daughter, Candace Boatfield, set the fire.

Inspector Mathis testified he interviewed the [Petitioner] in a car outside the [Petitioner's] residence at approximately 11:45 a.m. on the day of the murder. Mathis said the [Petitioner] held his head down and moaned with his hands covering his face. He observed others helping the [Petitioner] walk and get in and out of the vehicle as if he could not stand on his own. Mathis stated the [Petitioner] was aware his wife was dead. Mathis explained to him the police were investigating her death. Though the [Petitioner's] hands were covering his face, his eyes were darting to look at Mathis and to look out the window of the car. Mathis also noticed that although the [Petitioner] was making crying sounds, he was not shedding any tears. The [Petitioner] made comments indicating his wife was dead, such as, "She was my best friend." After Mathis ended the interview and as the [Petitioner's] sister helped the [Petitioner] out of the car, the sister told the [Petitioner], "She's dead." The [Petitioner] responded, "I didn't know she was gone." Mathis testified he found it unusual the [Petitioner] never asked him what had happened to his wife, how she had died, or where she was.

Melody Jones, the victim's sister, testified that when the family gathered following the murder, she observed the [Petitioner] sitting down, leaning with his hands over his face, but looking at the victim's family through his fingers. She said while the [Petitioner] wailed and made noises, she did not see any tears. Jones said the [Petitioner] made inconsistent statements about his and his wife's activities on the day of the murder. She

testified he initially said the victim was asleep when he left the house, but later said she was watching television and it was playing so loudly he told her to turn it down because she would not hear if anyone entered the house. The [Petitioner] told Jones he took Candace to school in his red truck. He said he later returned home, and without going in, picked up the purple truck in order to clean it. Jones also testified she did not know of any injury to the victim's hand.

The victim's father, Ray Smith, said he asked the [Petitioner] if he killed his daughter. The [Petitioner] replied that he "never laid a hand on her." Smith said the [Petitioner] became extremely nervous, began shaking, and left.

On March 13, 1998, Detective Dudley and other officers made a videotape as they walked through the house with the [Petitioner] and interviewed him. Detective Dudley testified that to his knowledge, the [Petitioner] was not told about the stab wounds to the victim's abdomen at the time the tape was made. As the officers and [Petitioner] reviewed the contents of the gun cabinet, the [Petitioner] pointed out that a knife was missing. The [Petitioner] drew a picture of the knife, showing that it had a single-edge blade.

Insurance agency employee, Gina Hembree, testified the [Petitioner] came by her office on March 18, 1998, before the agency received the fire report. When Hembree inquired as to how the fire began, the [Petitioner] told her he thought urethane on a jewelry box was ignited by a lighter or a candle. He also stated he had only been gone fifteen minutes when the fire began. On March 27, 1998, the [Petitioner] visited Hembree's office again and told Hembree police had located a witness, who was "dern [sic] near beat to death and in a coma." As the [Petitioner] made this statement, he looked Hembree "dead in the eye," giving her pause because he had also asked her if the police had spoken with her. There is nothing in the record to indicate the police ever located a witness who had been beaten.

On March 20, 1998, insurance investigator Walker interviewed the [Petitioner]. Walker questioned the [Petitioner] regarding whether he kept flammable liquids such as gasoline, kerosene, charcoal lighter fluid, or paint thinner. The [Petitioner] replied he did not. On July 1, 1998, Walker was present when the [Petitioner] stated he kept paint thinner under the sink and an empty can of Coleman fuel in an outbuilding. The [Petitioner] told Inspector Michael Mathis that there might have been charcoal lighter fluid under the kitchen sink, and matches were kept in the kitchen drawer.

When Detective Dudley questioned the [Petitioner] regarding his financial condition, he said he was financially stable and owed nothing on his home. In May 1993, the [Petitioner] was injured while working at a foundry and lost his job. Ray Smith, the victim's father, testified he assisted the defendant in establishing the business, Nursery Brokers, so the [Petitioner] could support his family. Smith stated the business "took off" and did better than he expected. When Smith turned the business over to the [Petitioner] in January 1997, the business owed little debt. Smith described the [Petitioner] as a poor businessman. Smith testified that in November 1997, the business's checks to a supplier and for rent were returned for insufficient funds. Other proof established the [Petitioner] had difficulty paying for telephone services and insurance.

In 1997, the Boatfields obtained an equity line of credit in the amount of $44,000 secured by their home. Wayne Upchurch, the bank's branch manager, testified that "Nicy" Boatfield was very reluctant to enter into the loan agreement and wanted safeguards to ensure no funds could be withdrawn without both signatures. Mr. and Mrs. Boatfield signed a written agreement requiring both of them to sign before funds could be withdrawn on the line of credit. The Boatfields purchased credit life insurance to pay the loan in the event either of them died. As of March 12, 1998, the balance due on the line of credit was approximately $50,000. On March 20, 1998, the [Petitioner] asked to file a claim on the credit life insurance. The [Petitioner's] claim was denied because the premium payments were delinquent at the time of the victim's death, which displeased the [Petitioner]. Later, the bank began foreclosure on the house. In addition to the credit life insurance, the [Petitioner] had insurance coverage on the house and its contents. The [Petitioner] told Walker during the March 20, 1998, interview his house payments were current, and he had just learned that they had credit life insurance to pay the outstanding balance.

Shortly before the murder, the Boatfields purchased a purple truck from Capital Toyota. Edward Virgil Emerson, a finance manager at the dealership, testified he assisted them with the financing. Emerson stated the victim was vehement about having the vehicle solely in her name because she would be making the payments and was upset when she learned that the only way financing could be obtained was to include the [Petitioner]. Emerson offered them credit life and disability insurance. The [Petitioner] asked if such insurance would pay for the vehicle if something happened to either of them. Emerson advised that coverage for both of them would be more expensive. The victim did not want to pay the extra expense for joint coverage, but the [Petitioner] agreed to pay for the additional expense. The insurance would have paid the debt on the vehicle upon the victim's death.

7

The victim was employed by the Dialysis Clinic, Inc. David Hagwood, director of human resources for the Dialysis Clinic, testified the [Petitioner] would have been entitled to benefits totaling $87,700. On June 10, 1998, the [Petitioner] applied only for her retirement benefits, which were approximately $15,700.

The Boatfield family members were close friends with Lonnie and Brenda Tripp and their children. They attended the same church and had vacationed together. Brenda Tripp also worked at the Dialysis Clinic. The Tripps' sons had worked at the [Petitioner's] business. In 1997, the Tripps began having marital problems, and at the time of the murder, they were divorcing. In August 1997, the [Petitioner] and Brenda Tripp traveled to Alabama to assist the Tripps' oldest son, whose car was disabled. In the months preceding the victim's death, numerous calls were made from the [Petitioner's] cellular telephone to Brenda Tripp's pager, home, place of employment, and cellular telephone. Likewise, numerous calls were made from Brenda Tripp's cellular telephone to Nursery Brokers, the [Petitioner's] cellular telephone, his pager and his home. The phone calls continued after the victim's death. The [Petitioner] repeatedly told Inspector Michael Mathis he did not know Brenda Tripp's cellular telephone and pager numbers. Hours after Inspector Mathis interviewed Brenda Tripp on March 27, calls were placed between the [Petitioner] and Brenda Tripp.

The [Petitioner] was openly involved in a romantic relationship with Brenda Tripp after the victim's death. Inspector Michael Mathis testified that in June 1998, police intercepted telephone calls between the [Petitioner] and Brenda Tripp in which it was apparent they were physically intimate. The state presented a tape recording of a conversation between the [Petitioner] and Tripp from June 19, 1998, indicating the two were having sexual relations. In February 1999, the [Petitioner] sent a letter to Lonnie Tripp claiming he was not involved with Brenda Tripp before the Tripps' separation, but apologized to Tripp for betraying his friendship. In the letter, the [Petitioner] also stated he had prayed for God and the victim to forgive him.

Melody Jones, the victim's sister, testified the Boatfields had marital problems for years. Jones stated the victim suspected the [Petitioner] was having an affair with Brenda Tripp.

The defense presented the testimony of Candace Boatfield and Eddie Boatfield, the [Petitioner's] brother, who testified the victim's hand appeared swollen after her death. Eddie Boatfield testified the [Petitioner] screamed

8

and cried hysterically after his wife's death. Officers also testified the [Petitioner] cooperated in the investigation by giving fingerprints, blood samples, interviews, and was willing to take a polygraph. Terry D. Traylor testified the [Petitioner] was not able to do lifting. The defense submitted medical records showing the [Petitioner] had undergone four surgeries on his cervical spine since his injury at work in 1993.

Tommy McMillin testified during cross-examination that when he saw the [Petitioner] at Nursery Brokers on the morning of the murder, there was no blood on the [Petitioner's] jacket; the [Petitioner] did not smell like gasoline; he did not appear to have been in a struggle; and he was behaving normally. The [Petitioner's] brothers testified for the defense that they found footprints approximately 100 feet behind the house at the back of the yard near the woods.

Candace Boatfield testified her mother knew the [Petitioner] went with Brenda Tripp to Alabama to assist Durand Tripp and was not upset. Candace Boatfield and Sharon Beaver testified Brenda Tripp and the victim slept in the same bed during a church trip to Gatlinburg two weeks before the murder. Witnesses testified the [Petitioner's] cellular telephone was used by many people, including Brenda Tripp's sons, who worked at Nursery Brokers.

Sabrina McMillin, the [Petitioner's] daughter from a prior marriage, testified for the defense that she listened to the tapes of the phone calls intercepted by the police from her father's and Brenda Tripp's phones and prepared a summary showing most of the phone calls were not between the Petitioner and Tripp. McMillin said she was never aware of any romantic relationship between Brenda Tripp and her father prior to the victim's death. Lonnie Tripp testified he did not accuse the [Petitioner] of being involved with his wife prior to the victim's death.

Candace Boatfield testified her parents continued to live together after the incident in which her mother found a candle burning by her bed, and her parents did not have any major arguments. She stated her mother joked about the candle incident. Officer Charles Russell testified he took a statement from the victim's mother, Martha McNabb, who said the victim did not name either the [Petitioner] or Candace Boatfield as a suspect who lit the candle in her bedroom.

John Hilhoit, administrator of the Dialysis Clinic, testified the victim earned over $28,000 in 1997 and over $26,000 in 1996. He confirmed the victim was being considered for a promotion at the time of her death.

Based on this evidence, the jury found the [Petitioner] guilty of premeditated first degree murder and abuse of a corpse.

*Boatfield*, 2001 WL 1635447, at *1-3. On appeal, this court affirmed the sufficiency of the evidence to support the convictions, and concluded that the trial court had not erred in making its rulings regarding the evidence admitted at trial. *Id.* We denied the Petitioner relief.

## B. Post-Conviction Facts

The Petitioner filed a timely petition for post-conviction relief in which he alleged that he had received the ineffective assistance of counsel and that his jury was tainted. *Boatfield*, 2006 WL 2135449, at *9. The post-conviction court denied the petition after a hearing, and this court affirmed. *Id.* at *1.

On September 20, 2019, the Petitioner filed a petition for a writ of error *coram nobis*. He alleged that there was newly discovered evidence in his case. He noted that his daughter had recently obtained a jewelry box containing jewelry belonging to the victim, which had been stolen at the time of the victim's murder. Additionally, the Petitioner alleged that Jerry McMillin, who was the brother of a suspect, Tommy McMillin, gave a deposition in which Jerry McMillin said that Tommy McMillin had admitted that he had murdered the victim.

The *coram nobis* court appointed counsel and held a hearing during which the parties presented the following evidence: Candace Boatfield, the daughter of the Petitioner and the victim, testified that she had always stood firm in her belief that her father had not committed this murder, and she had made it her life's goal to exonerate him.

Ms. Boatfield said that, in 1998 at the time of her mother's murder, she was fourteen and had a good relationship with both of her parents. She said that they also had a good relationship with each other, describing their relationship as similar to "any other married couple," meaning they argued but never fought. She recalled an incident where two trucks were stolen from her father's nursery. The aunt of a man named Jamie Harris called the Petitioner and said that her nephew, Mr. Harris, had stolen the vehicles. The Petitioner called the police, who told him not to retrieve the trucks because Mr. Harris was known to be dangerous. During the investigation of the victim's murder, law enforcement officers found Mr. Harris's fingerprint in their home.[1] She said that her father did not know Mr. Harris, that Mr. Harris did not work for her father, and that he had no reason to be in their

---

[1] We note that the trial transcript, which was made an exhibit at the *coram nobis* hearing, does not support this assertion.

10

home.  During the Petitioner's trial, law enforcement officers testified that they could not locate Mr. Harris to question him about the fingerprint.

Ms. Boatfield further testified that, recently, she had obtained jewelry taken at the time of the victim's murder.  She said that prior to being taken, the jewelry was kept in a painted chest that the Petitioner had painted, and the victim kept it in the living room.  The chest contained both valuable and costume jewelry.  Ms. Boatfield said that she obtained the painted chest in October 2016.[2]  Upon acquiring the chest, she called the police because she did not want anyone to think that the chest had been planted.  When officers arrived, she opened the chest and saw that it contained pieces of jewelry that she recognized and some that she did not recognize.  Ms. Boatfield reviewed a police report that indicated that she viewed the jewelry on October 7, 2016.  In the chest, Ms. Boatfield saw two matching diamond rings that the victim had made from earrings, one for Ms. Boatfield and one for Ms. Boatfield's sister.  The three items that she immediately recognized were, those rings, a dolphin ring, and an ankle bracelet.  She "begged" the officer to allow her to keep them, but he said that he could not because they were evidence but assured her that they would be returned to her.  She later learned that the Chattanooga Police Department destroyed the jewelry and the chest.

Ms. Boatfield said that, before learning the evidence had been destroyed, she called her attorney and the State's attorney and the police department multiple times in an attempt to obtain the jewelry.  Finally, she went to where the evidence was stored and was informed that all of the evidence had been destroyed.  The technician working told her that the items had been destroyed because the department did not know to whom it belonged.  Ms. Boatfield showed him her police report, which detailed her information, and he sent her to another building where she spoke with Sergeant Victor Miller.  He informed her that the evidence had indeed been destroyed.  Sergeant Miller took a copy of the police report she brought in, copied it, and returned the copy to her but not the original.  He acknowledged that the report clearly indicated what jewelry the responding officer had taken as evidence and to whom it belonged.  Ms. Boatfield left and someone from the mayor's office, Amy Greenholt, called and asked her about her intentions since the evidence had been destroyed.

Ms. Boatfield said that, at the time of her mother's murder in 1998, she told officers that Mr. Harris had recently stolen two of the Petitioner's trucks.  She told them that he was the only person that she could think of who would have wanted to hurt the victim.  The officer responded that he did not want her to accuse anyone of committing murder.

---

[2] It is unclear from this point in the testimony where the chest was found and whether it was in Mr. Harris's possession when found.  She later testified that her sister obtained the jewelry box from Mr. Harris.  In her affidavit, she swears that the chest and jewelry were "found by Leanna Boatfield at Roy Keahey's residence" and Leanna told her that "the items came from Jamie Harris['s] residence when they packed up his belongings when he went to jail."

Before she found the jewelry, Ms. Boatfield went to see Mr. Harris in jail. She said that, sometime after the victim's murder, Mr. Harris was incarcerated on other charges. She went to speak with him, and the county jail in which he was incarcerated recorded their meeting.

During cross-examination, Ms. Boatfield testified that Mr. Harris's sister-in-law, Leanna, and Ms. Boatfield's step-sister Sabrina Boatfield[3] were the ones who originally found her mother's jewelry. She said that when they located the jewelry it was still in the chest that the Petitioner had handpainted. She recalled that they had reported the chest missing at the time of the victim's murder because they noted that, after she was killed, it was no longer in the living room. The jewelry in the box had little monetary value but great sentimental value.

Ms. Boatfield agreed that she turned the jewelry into the Chattanooga Police Department. Ms. Boatfield identified her father's signature on an insurance claim that listed multiple items of jewelry that were destroyed in the fire or taken. Many of the items included in the chest were not listed on the insurance form.

Ms. Boatfield recalled that several other inmates had discussed Mr. Harris being involved with the victim's murder. Another man, Chris Johnson, who was a "serial killer" that lived close to the house where the victim was murdered, mentioned the victim's name while he was incarcerated years later. She tried to go and see him while he was incarcerated. Two attorneys from the district attorney's office, Mike Mathis and Neal Pinkston, learned of her intentions, and asked Mr. Johnson why she wanted to speak with him. They then put him in protective custody, and Ms. Boatfield was never able to speak with him. She asked the District Attorney if anyone had ever looked into whether Mr. Johnson had anything to do with the victim's murder. She also went to the District Attorney's office because Jerry McMillin had implicated Tommy McMillin in this murder.

Jerry McMillin testified that his brother, Tommy McMillin, married the Petitioner's daughter, Sabrina Boatfield. Jerry McMillin said that Tommy McMillin worked for the Petitioner regularly before the victim's murder. He recalled that, around 2009 well after the Petitioner had been convicted, he was at Tommy McMillin's house. Tommy McMillin was drinking, and Tommy McMillin, Jerry McMillin, and a friend Jonathan Gogan, were all watching television. Jerry McMillin said he had never before read about the case, and he and Tommy McMillin began to read through articles about the case. Tommy McMillin made some "weird snickering sounds" and "laughing." Jerry McMillin asked Tommy McMillin why he was laughing, and Tommy McMillin responded, "Because it was me."

---

[3] The transcript indicates that the Petitioner fathered both Sabrina Boatfield and Candace Boatfield, but the two had different mothers. Sabrina Boatfield was married to Tommy McMillin, who was the brother of Jerry McMillin. Jerry McMillin implicated his brother in the victim's murder.

Jerry McMillin said "what do you mean?" and Tommy McMillin said "I did it," which Jerry McMillin took to mean that Tommy McMillin committed the murder.

Jerry McMillin testified that he further questioned Tommy McMillin about why he would commit this murder, and Jerry McMillin said that it was because the victim was going to find out about "him and Candace," who was fourteen at the time. Tommy McMillin said that he was married to Sabrina Boatfield at the time, and he was concerned that the victim was going to learn that he was involved with Candace Boatfield also. Jerry McMillin said that he and Tommy McMillin began to argue, so Jerry McMillin left.

Several years later, Jerry McMillin went to the District Attorney's office to give a sworn statement about what Tommy McMillin had said. He said that, before so doing, Sabrina Boatfield had told him that an innocent man may be incarcerated for this murder, and he felt compelled to give what information he had from Tommy McMillin. At the time, Sabrina and Tommy McMillin were no longer together. Jerry McMillin said he was willing to take a polygraph to confirm his sworn statement. Jerry McMillin said that, after this and twelve or fifteen years after Tommy McMillin and Sabrina broke up, he and Sabrina began a relationship, and the two had been together for two or three years.

Jerry McMillin said that Tommy McMillin had a "reputation" for being with underage women, so this part of the story made sense to him. He did not believe Tommy McMillin murdered the victim until Tommy McMillin said he had. Jerry McMillin admitted that he did not like his brother "too much" but was adamant that he would never lie about what Tommy McMillin said to him.

During cross-examination, Jerry McMillin said he was not aware that Tommy McMillin had testified at the Petitioner's trial. Jerry McMillin said that he was in a relationship with Sabrina Boatfield when he gave his sworn statement, as the two started dating about a month before he gave his statement. He said that Tommy McMillin made the statement around 2009 but the first person he told about it was Sabrina, some nine years later. Jerry McMillin said that he did not tell anyone, in part, because he was unsure whether Tommy McMillin was telling the truth or boasting.

Jerry McMillin said that he spoke with Mr. Grogan, who was also present when Tommy McMillin made his statements, and Mr. Grogan said that, while he was there and remembered the statements, he did not want to get involved.

After the hearing, the *coram nobis* court issued written findings denying the Petitioner relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner contends that the *coram nobis* court erred when it denied

13

him relief. He asserts that the two pieces of newly discovered evidence, namely Tommy McMillin's confession and the painted chest containing jewelry from the victim's home, entitled him to relief. The State counters that the *coram nobis* court did not err. We agree with the State.

It is well-established that the writ of error *coram nobis* "is an extraordinary procedural remedy . . . [that] fills only a slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999). The decision to grant or to deny a petition for the writ of error *coram nobis* on its merits rests within the sound discretion of the trial court. *Ricky Harris v. State*, 301 S.W.3d 141, 144 (Tenn. 2010) (citing *State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007)). We, therefore, review for abuse of discretion. *See State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002). Tennessee Code Annotated section 40-26-105(b) provides, in pertinent part:

> Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error *coram nobis* will lie for subsequently or newly discovered evidence relating to matters which are litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at trial.

"As a general rule, subsequently or newly discovered evidence which is simply cumulative to other evidence in the record . . . will not justify the granting of a petition for the writ of error *coram nobis* when the evidence, if introduced," might not have resulted in a different outcome. *State v. Hart*, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995) (citations omitted); *see also Vasques*, 221 S.W.3d at 525-28 (noting that proper standard of review is whether the proffered evidence "might have" resulted in a different outcome rather than whether it "would have" resulted in a different one).

In order to qualify as newly discovered evidence, "the proffered evidence must be (a) evidence of facts existing, but not yet ascertained, at the time of the original trial, (b) admissible, and (c) credible." *Nunley v. State*, 552 S.W.3d 800, 816 (Tenn. 2018). In addition, the *coram nobis* petition must show why the newly discovered evidence "could not have been discovered in a more timely manner with the exercise of reasonable diligence" and how the newly discovered evidence, had it been admitted at trial, "may have resulted in a different judgment." *Id.* The statute presupposes that the newly discovered evidence would be admissible at trial. *Wilson v. State*, 367 S.W.3d 229, 235 (Tenn. 2012); *see also State v. Hart,* 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995) (rule requiring *coram nobis* court to find that newly discovered evidence may have resulted in a different judgment "presupposes that the evidence . . . would be admissible pursuant to the applicable rules of evidence . . . .").

"[T]he relief being sought via a writ of error *coram nobis* 'is the setting aside of the

judgment of conviction and the granting of a new trial.'" *Payne*, 493 S.W.3d at 485 (quoting *Harris II*, 301 S.W.3d at 150 n.8 (Koch, J., concurring)).

### A. Tommy McMillin's Confession

The Petitioner contends that the *coram nobis* court erred when it denied him relief based upon testimony regarding Tommy McMillin's confession. The State counters that the petition in this regard was untimely and that the trial court was within its discretion when it determined that the testimony about Tommy McMillin's confession was not credible.

About this evidence, the *coram nobis* court found:

> *Mr. Tommy McMillin's confession*
>
> Mr. Jerry McMillin disclosed his brother Tommy's 2007 or 2009 confession to the [P]etitioner's daughter Sabrina not long before giving the 06/20/2018 deposition, Exhibit 6. Thus, apparently, the [P]etitioner learned of the confession about sixteen years after the judgments of conviction became final.
>
> The state seems to fault the [P]etitioner for not establishing a sufficient reason for the delay between Tommy's 2007 and 2009 confession and Jerry's 2018 disclosure of the confession. Jerry's delay, however, is not attributable to the [P]etitioner, who did not have any reason to pester anyone to confess or disclose a confession. In these circumstances, it appears that due process requires suspension of the statute of limitation until the [P]etitioner's discovery of the confession.
>
> It is not clear precisely when the [P]etitioner, who did not testify at the *coram-nobis* hearing, learned of Tommy's confession. Presumably, he was aware of it for at least fifteen months before he filed the subject petition on 09/30/2019 because he attributes the delay to not having become "fully aware" of the contents of Jerry's 06/20/2018 deposition until his receipt of the transcript, after which he filed the subject petition within one year.
>
> Although the [P]etitioner could not file a petition for the writ of error *coram nobis* claiming a newly discovered third-party confession without some proof of such a confession such as the transcript of Jerry's 06/20/2018 deposition, the [P]etitioner did not testify at the *coram-nobis* hearing and there is no evidence that the distinction between awareness and full awareness in this case was meaningful, *i.e.*, comparable to the distinction between lack of discovery and discovery. Thus, arguably, in these

15

circumstances, it appears that the [P]etitioner did not act with reasonable diligence in presenting the claim of the newly discovered confession. . . .

Even if the claim of the newly discovered confession were timely, however, it would not warrant a new trial. The [P]etitioner contends that, had the jury heard the newly discovered confession, they might have believed that Tommy killed the victim when she discovered him "messing with Candace, which is the little sister, which was under age at the time." . . . The Court respectfully disagrees for several reasons.

First, the veracity of Tommy's confession or Jerry's account of Tommy's confession is doubtful. The confession lacks detail and contradicts evidence at trial, including the [P]etitioner's own statements, Tommy's testimony, and telephone and security records, that Tommy was at the [P]etitioner's business during the relevant time, receiving a call from the [P]etitioner at the business at 8:57 a.m., seeing the [P]etitioner at the business fifteen to twenty minutes later and not seeing blood or indications of a struggle, smelling gasoline, or noticing any abnormal behavior, and receiving a call for the [P]etitioner from the Boatfield's home security service at 9:27 a.m., five minutes after the service's receipt of a fire alarm at 9:22 a.m.

In addition, in his deposition . . . Jerry even admits that the other person who was present on the occasion of Tommy's confession did not remember Tommy's confessing or saying that he "did it", though the other person did remember thinking for an unspecified reason that it was possible that Tommy was the perpetrator . . . .

Second, even if Jerry's account of his brother Tommy's history of "lik[ing] young girls" is true, . . . there is no evidence that Candace, who did not mention sexual abuse in her testimony, was a victim of such abuse by Tommy, who, at the time, was her brother-in-law. Without such evidence, it is unreasonable to believe that Tommy did in fact, have such a motive.

Third, unlike Tommy, the [P]etitioner did have opportunity and perhaps a financial or romantic motive to kill the victim. According to his statements, he did not leave home, where he spoke to his wife and called his brother at the business, until 9:15 a.m. or at least some time after 9:00 a.m., almost immediately before the home's security service's receipt of a fire alarm at 9:22 a.m.

Fourth, although a tire tool that Tommy had used while repairing a car in the Boatfield's backyard and left in the backyard by an outbuilding the day before the murder was found on the floor, as the Court of Criminal Appeals

16

remarks or suggests, the victim was shot with the [P]etitioner's gun, the [P]etitioner's fingerprints were on the container of ammunition, the [P]etitioner "made numerous inconsistent and false statements" in his accounts of events, and the presence at the scene of weapons and other valuables in plain view belies the appearance of burglary. *Boatfield*, 2001 WL 163447 at \*10. In such circumstances, there is no reasonable basis for concluding that, had Jerry's hearsay account of his brother Tommy's 2007 or 2009 confession been admitted at trial, the result of the proceedings might have been different.

After review, we conclude that the trial court did not abuse its discretion when it determined that the Petitioner was not entitled to *coram nobis* relief on the basis of Tommy's alleged confession to Mr. McMillin. Whether timely filed or not, the *coram nobis* court found that Mr. McMillin's account of the confession was "doubtful." The Petitioner essentially asks this court to ignore the *coram nobis* court's credibility determinations and to reweigh the evidence. This court cannot "second guess the trial court's evaluation of the witnesses' credibility." *Newsome v. State*, 995 S.W.2d 129, 135 (Tenn. Crim. App. 1998). Accordingly, and based on the *coram nobis* court's findings, we conclude that the Petitioner is not entitled to relief on this issue.

### B. Jewelry Box

The Petitioner also contends that the *coram nobis* court erred when it found that the missing painted jewelry chest discovered years after this murder did not constitute newly discovered evidence. The State counters that the Petitioner's claim is untimely. Even if timely filed, the State asserts that evidence about the painted chest would be inadmissible hearsay. The *coram nobis* court found:

*Box containing jewelry and other items*

The Court first considers the box containing jewelry and other items. According to Ms. Boatfield, on 10/07/2016, she conveyed the box and its contents to police and, the next morning, informed the [P]etitioner by email of the recovery of the box. Thus, the [P]etitioner learned of the recovery of the box more than fourteen years after the judgments of conviction became final. In these circumstances, it appears that due process requires suspension of the statute of limitations until the [P]etitioner's discovery of the recovery of the box.

The [P]etitioner, however, also learned of the recovery of the box almost three years before he filed the subject petition on 09/30/2019. He attributes the delay to his belief that, after the discovery of the box in the

17

possession of a possible alternative perpetrator, Mr. Jamie Harris, there was some official investigation.

From two of the exhibits, it appears that perhaps, at least for a short time, such a belief was not unreasonable, though the promise to "follow up" in one is ambiguous and the referral of the matter to the district attorney general in the other is suggestive of review as much as investigation. The incident narrative in the police report, Exhibit 2, states in part:

> Candace advised that she wanted to turn the property over to police as evidence that would prove that Jamie Harris had committed the murder and not her father. I then contacted Investigator Holloway, Car 301, about the incident, who advised to turn the property in to the CDP [sic] property room and that it would be followed up on. I then turned the evidence in to the CPD property room under property number 16-4100 with a reference to the original case property number of 98-0651.
> 3-- Pending/Poosible [sic] Leads.

Exhibit 2, Incident Narrative.

In addition, the series of emails and forwarded emails to and from Inv. Holloway, Exhibit 5, begins with a 10/22/2016 email from Ms. Candace Boatfield to Det. Holloway explaining in detail the circumstances of the recovery of the property, continues with Det. Holloway's response indicating that he was in Germany on military leave until 11/08-2016 and had forwarded all information to the office of the district attorney general and suggesting that she contact Mr. Lance Pope at that office or him on his return, and ends with contemporaneous and subsequent forwards of those emails, including last year, on 05/16/2019, with the claim "I have forwarded this all to Cpt and AC, this is on property and DA office" and last month, on 08/13/2020, with the note "this may help".

In any event, arguably, at some point, a delay of almost three years on the basis of a belief in an ongoing official investigation becomes unreasonable without ongoing misrepresentation of the existence of such an investigation. Thus, in these circumstances, it appears that the [P]etitioner did not act with reasonable diligence in presenting the claim of the newly discovered box.

Even if the claim of the newly discovered box were timely, however, it would not warrant a new trial. The Court understands the [P]etitoner to

contend that, had the jury heard the newly discovered evidence about the box, they might have believed that Mr. Harris killed the victim during a burglary or theft. The Court respectfully disagrees.

About the recovery of the box, there was only one witness, Ms. Boatfield, who did not participate in and was not present at the scene of the recovery. As she herself acknowledges in the email to Inv. Holloway, her account of the circumstances of the recovery of the box depends on hearsay. Exhibit 5.

Absent an exception to the hearsay rule, hearsay is not admissible. *See* Tenn. R. Evid. 802 . . . [and] 803 . . . .

Although Ms. Boatfield identifies the box as having been painted by her father and as having contained some jewelry belonging to her and her mother, the box's exculpatory value depends on the circumstances of its subsequent recovery, the only evidence of which is Ms. Boatfield's hearsay account for which the [P]etitioner does not assert a hearsay exception. Thus, Ms. Boatfield's account of the circumstances of the recovery of the box being hearsay and not admissible, it does not constitute newly discovered *evidence* within the meaning of T.C.A. § 40-26-105 . . . and the box lacks exculpatory value. In such circumstances, there is no reasonable basis for concluding that, had the box been admitted at trial, the result of the proceedings might have been different.

Of course, arguably, the newly discovered evidence in this regard is the apparent lack of official action other than to destroy the box. From the gap from 2016 to 2019 in the series of Det. Holloway's emails, Exhibit 5, it appears that the [P]etitioner's family did not discover the inaction or destruction until a few months before the [P]etitioner filed the subject petition.

Even if any claim of newly discovered official inaction on or destruction of the box were timely, however, it would not warrant a new trial. The official inaction on or destruction of the box cannot be more consequential than the box, which, for the preceding reasons, is not consequential. In such circumstances, there is no reasonable basis for concluding that, had evidence of official inaction on or destruction of the box been admitted at trial, the result of the proceeding might have been different.

The first issue before us is whether the statute of limitations bars the Petitioner's writ on the basis of the jewelry box. In *Burford*, our supreme court discussed the due process requirements that govern access to post-conviction relief. *Burford v. State*, 845

S.W.2d 204 (Tenn. 1992) (later applied by *Workman v. State*, 41 S.W.3d 100 (Tenn. 2001) to a writ of error *coram nobis*). The *Burford* court concluded that even when a statute of limitations is not unconstitutional on its face, "'it is unconstitutional as applied [if] it denies [a petitioner] due process under the state and federal constitutions.'" *Workman*, 41 S.W.3d at 102 (citing *Burford*, at 205). In reaching that conclusion, the supreme court recognized that,

> before a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner.
>
> . . . .
>
> . . . it is possible that under the circumstances of a particular case, application of the statute may not afford a reasonable opportunity to have the claimed issue heard and decided.

*Burford*, at 208. In determining what process is due for post-conviction claims, or in other words, what opportunity must be given, the court used this balancing analysis that should consider both the governmental interests involved and the private interests affected by the official action. After making these considerations in *Burford*, the supreme court held that the claim, filed beyond the statute of limitations, was not barred.

After reviewing the relevant interests herein, we agree with the trial court that due process does not require the tolling of the applicable statute of limitations. In this case, the governmental interest in asserting the statute of limitations is the prevention of stale and groundless claims. The private interest involved here is the Petitioner's opportunity to have a trial wherein the newly discovered evidence is presented. The Petitioner knew of the existence of the jewelry box for three years and did not pursue *coram nobis* relief. As the trial court noted, a delay of almost three years on the basis of a belief in an ongoing official investigation becomes unreasonable without ongoing misrepresentation of the existence of such an investigation. We further conclude, as did the trial court, that the Petitioner did not act with reasonable diligence in presenting the claim of the newly discovered jewelry box.

We now turn to address, assuming that due process considerations would trump the statute of limitations, whether the newly discovered evidence warrants a new trial. In order to qualify as newly discovered evidence, "the proffered evidence must be (a) evidence of facts existing, but not yet ascertained, at the time of the original trial, (b) admissible, and (c) credible. *Nunley v. State*, 552 S.W.3d 800, 816 (Tenn. 2018). In addition, the *coram nobis* petition must show why the newly discovered evidence "could not have been discovered in a more timely manner with the exercise of reasonable diligence" and how

the newly discovered evidence, had it been admitted at trial, "may have resulted in a different judgment." *Id.*

We agree with the *coram nobis* court that the relevance of the painted chest hinges on it being found in the possession of Mr. Harris. Ms. Boatfield testified that she obtained the jewelry chest from her sister. Her sister did not testify at the *coram nobis* proceeding, and there is no proof as to where her sister obtained the painted jewelry chest. Ms. Boatfield offered hearsay evidence that her sister said that she got the chest from Mr. Harris's ex-wife, but such evidence would not be admissible at trial. We conclude that the trial court did not abuse its discretion when it determined that the jewelry chest evidence would not have resulted in a different judgment. Accordingly, we affirm the *coram nobis* court's judgment.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the *coram nobis* court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

21